**This order is SIGNED.**



**Dated: September 30, 2015**



**R. KIMBALL MOSIER**
**U.S. Bankruptcy Judge**

---

## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| In re:<br><br>DigitalBridge Holdings, Inc.,<br><br>Debtor.<br><br>———————<br><br>J. Kevin Bird, Trustee,<br><br>Plaintiff,<br><br>v.<br><br>SKR Credit, Ltd., a Wyoming corporation,<br>SKR Holdings, Ltd., a Wyoming<br>corporation, SKR Management, Ltd., an<br>Arizona corporation, and Steve Robson, an<br>individual,<br><br>Defendants. | Bankruptcy Number. 10-34499<br><br>Chapter 7<br><br>———————<br><br>Adversary Proceeding No. 12-2373<br><br>Judge R. Kimball Mosier |

## MEMORANDUM DECISION

Debtor DigitalBridge Holdings, Inc. borrowed money from three lenders, who mistakenly thought their security interests had been perfected. DigitalBridge had undertaken the responsibility to file the lenders' UCC financing statements, but a filing error left their interests unperfected. DigitalBridge later borrowed money from another lender, which properly perfected its security interest, giving it priority over the other lenders. After DigitalBridge declared bankruptcy, J. Kevin Bird (Trustee) filed this action against the later lender and its related entities, seeking to remove the later lender from its first lien position. The Trustee argued principally that the later lender acted inequitably in receiving its first lien position because at the time it made the loan, it knew of the filing error, and one of its related entities was managing DigitalBridge and failed to inform DigitalBridge of that error.

The matter proceeded to trial, and after the Trustee fully presented his case, the Defendants moved for judgment on partial findings under Fed. R. Civ. P. 52(c). The Defendants' Rule 52(c) motion was fully briefed and argued by the parties. After considering the evidence, including facts as stipulated or admitted by the parties, adduced from the testimony of witnesses, or established by the introduction of exhibits, and after assessing the demeanor and credibility of the witnesses, and considering the arguments of counsel, and conducting an independent review of the law, the Court has determined that the Defendants' Rule 52(c) motion should be granted and the Court will enter judgment against the Trustee on all claims. In particular, the Trustee presented no credible evidence that the Defendants engaged in inequitable conduct. The evidence shows that DigitalBridge's board of directors, desperate to limit their personal liability, knowingly and consciously entered into agreements with the Defendants that enabled DigitalBridge to receive nearly $400,000.

2

This memorandum decision constitutes the Court's findings of fact and conclusions of law as required by Fed. R. Civ. P. 52(a), made applicable to this proceeding by Fed. R. Bankr. P. 7052 and incorporates by reference any oral rulings made on the record at trial. Any of the findings of fact herein are also deemed, to the extent appropriate, to be conclusions of law, and any of the conclusions of law herein are similarly deemed to be findings of fact, and they shall be equally binding as both.

## I. JURISDICTION

The jurisdiction of this Court is properly invoked under 28 U.S.C. § 1334. This is a core proceeding within the meaning of  28 U.S.C. § 157(b)(2)(H), (K) & (O) and this Court may enter a final order. Venue is proper under the provisions of 28 U.S.C. § 1408 and § 1409.

## II. FINDINGS OF FACT

At one time, DigitalBridge had more than 200 employees, but by the end of 2009 DigitalBridge was on its last legs and had fewer than ten employees. DigitalBridge was not able to pay its operating expenses, including wages and withholding taxes, and determined that the sale of its assets was the best resolution of the predicament it was facing. DigitalBridge's primary assets were intellectual property rights and associated software programs that facilitated the scheduling of staff and service providers in the healthcare industry, managed student records in the education industry, and facilitated the issuance of warrants in the justice system.

### A. DigitalBridge Borrows Funds—The Equity Holder Loans

In order to maintain minimal operations while it attempted to sell its assets, DigitalBridge

borrowed funds from equity holders, or their companies.[1] The companies that loaned funds to

DigitalBridge (Equity Lenders) were: PGK Investments, LLC (PGK), which was owned and

controlled by Ken Howard; the Frankenberg Family Trust (FFT), which was controlled by Bob

Frankenberg; and Uniti, Inc. (Uniti), which was controlled by Terry Pitts. The loans from these

companies (Equity Holder Loans) were as follows:

| PGK | $80,000 | December 8, 2009 |
| FFT | $63,600 | December 23, 2009 |
| Uniti | $28,600 | December 23, 2009 |
| PGK | $85,000 | December 31, 2009 |
| PGK | $40,000 | March 4, 2010 |
| PGK | $45,000 | March 29, 2010 |
| FFT | $20,000 | March 29, 2010 |

Each of the Equity Holder Loans was evidenced by a promissory note that granted the lenders a

security interest in all of DigitalBridge's assets. Each promissory note provided that it would be

"subject to a UCC filing to be undertaken by Borrower." DigitalBridge's board of directors

believed that DigitalBridge had correctly fulfilled its obligation with respect to the UCC filings,

but DigitalBridge erroneously filed the UCC financing statements in Utah (DigitalBridge's

principal place of business) instead of Delaware (where DigitalBridge was incorporated).

DigitalBridge's failure to properly perfect the Equity Lenders' security interests will be referred

to as the "Perfection Issue."

---

[1] It is not clear from the evidence whether the companies were equity holders or the individuals were equity holders, but it is undisputed that the loans were from or at the direction of equity holders.

**B. DigitalBridge Attempts to Sell Its Assets**

In late 2009 or early 2010, DigitalBridge began discussions with Steven Robson

regarding the sale of DigitalBridge's assets. Robson was particularly interested in acquiring all of

the assets related to DigitalBridge's healthcare-related business (Healthcare Assets). Robson is

the trustee of the Steven Robson and Kimberly Robson Family Trust, and in his capacity as

trustee, Robson is the majority owner of, and controls a number of entities including, KDB

Finance, LLC, SKR Credit, Ltd., SKR Holdings, Ltd., and SKR Management, Ltd. (collectively

referred to as the "SKR Entities"). In early 2010, DigitalBridge offered to sell the Healthcare

Assets to Robson, or one of his entities, for approximately $945,000. The offer was rejected, but

negotiations continued. In the meantime, DigitalBridge continued to have an urgent need for cash

to pay employee salaries and other operating expenses. To meet this need, KDB agreed to loan

DigitalBridge $33,212. The loan from KDB was evidenced by a note (KDB Note) together with a

security agreement that granted KDB a security interest in all of DigitalBridge's assets.

Robson and the SKR Entities eventually entered into a series of agreements related to the

acquisition of the Healthcare Assets. On or about June 21, 2010, DigitalBridge entered into an

Asset Purchase Agreement (APA) with SKR Holdings; a Multiple Advance Promissory Note

(MAP Note or Robson Loan)[2] with SKR Credit and an accompanying security agreement (SKR

Security Agreement); and a Management Agreement (Management Agreement) with SKR

Management. (The foregoing agreements are collectively referred to herein as the Original SKR

Agreements.) Although the Original SKR Agreements were between DigitalBridge and three

---

[2] The Management Agreement specifically refers to the MAP Note and SKR Security
Agreement as the Robson Loan. For the remainder of this decision, the Court will refer to the
Robson Loan as the MAP Note.

different entities controlled by Robson, Frankenberg and Ronald Maines, who were the only members of DigitalBridge's board of directors at the time of the negotiations (Board), viewed the negotiations to be primarily with Robson.

Under the APA, SKR Holdings agreed to purchase the Healthcare Assets for $475,000 on the condition that DigitalBridge deliver title to the Healthcare Assets free and clear of liens. The APA specifically provided that the purchase price would be allocated to pay the secured claims of PGK ($250,000), FFT ($85,000), and Uniti ($33,000), and the remaining $107,000 would be retained by DigitalBridge. The APA contemplated that closing would occur by June 30, 2010.

Under the Management Agreement, SKR Management agreed that by August 21, 2010 it would "either, (i) draw on the [MAP Note] and utilize the proceeds (together with the Company's then existing cash resources) to satisfy the specific Company obligations listed on Schedule 1 to [the Management Agreement] . . . or (ii) submit a proposal acceptable to the Company's Board of Directors providing for the deferred and/or structured satisfaction of the Required Payments."[3] The Management Agreement acknowledges the MAP Note as a potential source of cash for the Required Payments. The MAP Note provided that any advances were to be at SKR Credit's "sole and absolute discretion," and that any advances would only be made upon written request from SKR Management.

The Management Agreement also provided in section 3.b.(vii) that SKR Management would, "to the extent that funds of the Company are available, pay all debts and obligations of the Company as they become due." Section 9(b) of the Management Agreement expressly

---

[3] Management Agreement, section 5. The Required Payments defined in the Management Agreement are the specific Company obligations listed on Schedule 1 and consist primarily of the obligations for which the Board believed they were personally liable.

provided that SKR Management would not be liable for "(i) the failure of SKR Lender to fund any Company expenses; (ii) the Company's failure to pay or meet its obligations; or (iii) business decisions made by Manager in accordance with this Agreement so long as those decisions are made in the good faith exercise of Manager's business judgment, and do not involve fraud, gross negligence or intentional misconduct on the part of the Manager and/or any Actor." The Management Agreement also stated that, other than the specific contractual obligations in the Management Agreement, SKR Management had "no fiduciary or similar obligation to the Company, its Board of Directors or shareholders."[4]

The Management Agreement gave SKR Management complete power to manage and control DigitalBridge's business and affairs, subject to specific limitations. SKR Management was prohibited from "pledging any asset of the Company, or otherwise encumbering, liening, or mortgaging (whether by chattel mortgage or other security interest) the assets of the Company, or otherwise allowing security interests to attach to the assets of the Company."

Under the MAP Note and the SKR Security Agreement, SKR Credit agreed, subject to "its sole and absolute discretion," to advance up to $500,000 to DigitalBridge, and DigitalBridge agreed to grant SKR Credit a security interest in all of DigitalBridge's assets. All principal advanced under the MAP Note was due and payable on December 31, 2010. Prior to entering into the MAP Note, Robson became aware of the Perfection Issue. When the MAP Note was executed, Robson had not informed the Board of the Perfection Issue. SKR Credit perfected its security interest by filing a UCC financing statement in Delaware. The prior KDB Note was treated as a principal advance under the MAP Note. Accordingly, upon execution of the MAP

---

[4] Management Agreement, section 3.c.

Note, DigitalBridge's obligation to KDB under the KDB Note was satisfied and was replaced by an obligation to SKR Credit under the MAP Note for the same amount.

Although Robson was aware of the Perfection Issue, there is no evidence to suggest that he was aware, at the time the MAP Note was signed, that DigitalBridge had agreed to undertake the UCC filings for the Equity Lenders. The Equity Lenders did not conduct any business with DigitalBridge while the Management Agreement was in effect, and there was no evidence that the Equity Lenders relied on Robson or any of the SKR Entities for any of their business dealings.

## C. Parol Evidence Respecting the Original SKR Agreements

The Trustee introduced parol evidence to demonstrate that DigitalBridge had no ability to repay the MAP Note and that this evidence supported his claim for recharacterization.[5] He argued that this evidence was not prohibited by the parol evidence rule because it was not intended to contradict the terms of the Original SKR Agreements. The Trustee's witnesses testified that: 1) the APA and the MAP Note were in fact an agreement to purchase the Healthcare Assets for $975,000; 2) even though SKR would have a lien on all of DigitalBridge's assets, SKR Credit did not intend to enforce the MAP Note, and SKR Credit would walk away from the assets; and 3) although the Original SKR Agreements were tied together, SKR Management was obligated to resolve the Required Payments by drawing on the MAP Note or taking care of them regardless of whether the APA closed.

---

[5] Although the Trustee abandoned his recharacterization claim, the Court will address the parol evidence.

While the witnesses' testimony with respect to DigitalBridge's inability the repay the MAP Note does not necessarily contradict the Original SKR Agreements, the testimony with respect to SKR Credit's agreement that it would not enforce the MAP Note was clearly parol evidence that contradicted the Original SKR Agreements. The same holds true for testimony that the Original SKR Agreements were in fact an agreement to purchase the Healthcare Assets for $975,000 and the testimony that SKR Management was obligated to make the Required Payments. But the Original SKR Agreements are not ambiguous. Robson could have purchased the Healthcare Assets for $475,000 if DigitalBridge had been able to obtain the release of the Equity Lenders' liens. Robson was not required to loan any funds to DigitalBridge under the Original SKR Agreements, but could have loaned any amount up to $500,000 and have had a perfected and enforceable lien for that amount. SKR Management had no liability for failing to make the Required Payments.

Additionally, the Trustee's parol evidence lacked credibility because of the inconsistencies in the witnesses' testimony. The Court finds Frankenberg's and Maines's testimony that Robson agreed to purchase the Healthcare Assets for $975,000 to be not credible. It is an undisputed fact that Robson rejected DigitalBridge's offer to sell the Healthcare Assets for $945,000. Frankenberg and Maines acknowledged that, even if SKR Management made a request, SKR Credit had no obligation to fund the MAP Note. Frankenberg attempted to characterize the MAP Note as the variable portion of the purchase price but also acknowledged that there was no requirement that SKR Credit lend any amount. Both Frankenberg and Maines acknowledged that if DigitalBridge could have delivered the Healthcare Assets free and clear of

9

liens, SKR Holdings could have purchased the Healthcare Assets for $475,000 without providing

any additional funding.

**D. DigitalBridge and the SKR Entities Amend the Original SKR Agreements**

SKR Credit made two advances under the MAP Note. One on July 28, 2010 for

$13,775.97, and the other on August 12, 2010 for $25,000.00. There is no evidence that SKR

Management made any other attempt to draw on the MAP Note, and it is clear that SKR Credit

did not advance sufficient funds under the MAP Note to make the Required Payments.

After the Original SKR Agreements were signed, Robson began negotiating with the

Equity Lenders to resolve their loans. Robson's negotiations with Ken Howard regarding the

PGK loan promptly broke down largely because of an animosity between Howard and Robson. It

turned out that Howard wanted to acquire DigitalBridge's assets and he asserted that PGK's

claim had ballooned from $250,000 to over $500,000.

When DigitalBridge was unable to deliver the Healthcare Assets free of liens by the

closing date of June 30, 2010, Robson proposed to amend the Original SKR Agreements. On

August 13, 2010, Robson, through SKR Management, sent a proposed Acknowledgment of

Termination of Management Agreement (Termination Agreement) to DigitalBridge. Meanwhile,

the DigitalBridge Board urgently wanted to acquire funds to pay off obligations for which they

were personally liable. In an email dated September 9, 2010, Maines stated that DigitalBridge

required the immediate funding of a $300,000 loan. Sometime before September 16, 2010, the

Termination Agreement was signed by the parties, and amendments to the APA and the MAP

Note (Amended SKR Agreements) were signed on or about September 16, 2010.

10

The Management Agreement was terminated "*ab initio*, as though it had never been executed." DigitalBridge released SKR Management from all claims relating to the Management Agreement, even though Frankenberg and Maines testified that they believed DigitalBridge had significant claims against SKR Management. They also testified that under the circumstances they believed it was a reasonable and appropriate decision to terminate the Management Agreement. There is no evidence that Robson coerced DigitalBridge or took unfair advantage while negotiating the Termination Agreement.

The MAP Note, as amended (Amended MAP Note), was changed to a demand note instead of being due and payable on December 31, 2010. Also, under the Amended MAP Note, SKR Credit's discretion to loan up to $500,000 was removed and replaced with a non-discretionary obligation to make an additional loan of $300,000. DigitalBridge used the $300,000 to pay obligations that the Board considered to be critical.

The APA was amended (Amended APA) to reduce the purchase price from $475,000 to $400,000. Schedule 2.2 was expressly "deleted and replaced with new **Schedule 2.2**" (emphasis in original), and the sale proceeds were to be used to pay "Perfected Secured Obligations" as opposed to the claims of the Equity Lenders as specified under the APA. Maines and Frankenberg claim that they thought this change was of no significance.

On September 16, 2010, after the APA and MAP Note were amended, Robson sent an email to Frankenberg, Maines, and others stating: "I think we are at the point to get the wire done. . . . I will need wiring instructions to complete. This $300,000 wire constitutes the entire 'required advances' under the Amended Multiple Advanced Note." The following day, SKR Holdings advanced $300,000 to DigitalBridge. The Board made no distinction among the

11

Robson entities,[6] and it is clear that the parties understood and agreed that the $300,000 wire

transfer from SKR Holdings to DigitalBridge on September 17, 2010, constituted an advance

made by SKR Credit under the Amended MAP Note.

**E. Parol Evidence Respecting the Amended SKR Agreements**

The Trustee introduced parol evidence to demonstrate that the Amended SKR

Agreements were obtained by fraud and unfair advantage. He argued that this evidence was not

prohibited by the parol evidence rule because it was not intended to contradict the terms of the

Amended SKR Agreements. Frankenberg and Maines testified that they were unaware of the

Perfection Issue when they signed the Amended SKR Agreements and that DigitalBridge would

have perfected the Equity Lenders' liens if they had known of the Perfection Issue. Frankenberg

testified that he would not have signed the Amended SKR Agreements if he had known that SKR

Credit would hold a first position lien on DigitalBridge's assets. Maines testified that he assumed

the phrase "perfected secured obligations" in Schedule 2.2 of the Amended MAP Note was a

"gloss."[7] Frankenberg testified that Robson agreed that SKR Credit would not foreclose until

DigitalBridge had been given an opportunity to perform under the Amended APA. Frankenberg

also testified that the demand for payment would not be enforced if DigitalBridge could deliver

the Heathcare Assets free and clear of liens.[8] Maines and Frankenberg testified that they had no

recollection of any discussions regarding foreclosure.[9]

---

[6] Trial Transcript of Aug. 21, 2014, at 22:10–11.

[7] Trial Transcript of Aug. 21, 2014, at 18:5–7.

[8] Trial Transcript of Aug. 19, 2014, at 132:20–22.

[9] Trial Transcript of Aug. 21, 2014, at 37:10–13; Trial Transcript of Aug. 20, 2014, at
75:2–76:5.

12

The Court finds that Frankenberg's and Maines's testimony is not credible. Specifically, the Court does not find the witnesses' testimony that they were unaware that SKR Credit's lien would have priority over the other loans to be credible. The Court does not find the witnesses' testimony that SKR Credit agreed not to foreclose on its lien to be credible or supported by other evidence.

Although the Court allowed parol evidence to be admitted, the Trustee introduced no evidence that Robson made any false representation to DigitalBridge regarding the Equity Lenders' lien status during the negotiation of the Amended SKR Agreements. The Trustee's only evidence with respect to Robson's alleged failure to disclose the Perfection Issue prior to the Amended SKR Agreements consisted of Frankenberg's and Maines's testimony. Not only does this testimony conflict with the terms of the Amended APA, which Frankenberg and Maines signed, the evidence shows that at least Maines was aware of the Perfection Issue prior to the Amended SKR Agreements. On September 22, 2010, David Shein, Robson's attorney, and Maines exchanged email messages (Shein/Maines Email Exchange).[10] Frankenberg was copied on the emails but claimed to have no recollection of receiving the emails. Shein initiated the Shein/Maines Email Exchange with an email informing Maines that Robson had been unable to reach an agreement with Howard and that Robson was anxious "to proceed with either the purchase and sale, or foreclosure scenarios we outlined in our discussions leading up to the recent round of amendments." Shein also stated that there would be a final attempt to reach an agreement with Howard that day but if it was not successful, "[Robson] will make the election to proceed as a secured creditor and foreclose, addressing [Howard's] claims as a competing

---

[10] Defendants' Ex. D.

13

creditor." In his email reply, Maines stated "We had suspected this to be a likely scenario, given our incredulity that [Robson] and [Howard] could actually come to terms. We also had an understanding from [Robson] that no foreclosure action would be taken without reviewing it with us first."

Moreover, an analysis of the Amended SKR Agreements provides compelling evidence that the Board knew that SKR Credit would be in a first position. Frankenberg's and Maines's testimony that they were unaware of the significance of the amendment to Schedule 2.2 of the APA or that it was "a gloss" fails when closely scrutinized. The deletion of the original Schedule 2.2 and its replacement with the new Schedule 2.2 was obvious and meaningful. Had the Board believed that the Amended APA proceeds were to be paid to the Equity Lenders, there would have been no need to replace the original Schedule 2.2. Frankenberg and Maines were aware that the Equity Lenders had been unwilling to release their liens for $475,000 and failed to explain why the Equity Lenders would release their liens at the reduced price of $400,000. Frankenberg's and Maines's testimony is also not credible because Robson's agreement to loan an additional $300,000 in a fourth position is inconsistent with Robson's rejection of the original $945,000 offer. Specifically, Frankenberg and Maines knew that DigitalBridge was unable to complete the original APA because Howard, on behalf of PGK, was asserting a claim for $500,000 to $600,000. If Frankenberg and Maines are to be believed, Robson agreed to loan a total of $371,775.97, knowing he would have to pay an additional $618,000 to $718,000 to obtain a release of the Equity Lenders' claims. This total clearly exceeds the purchase price Robson previously rejected.

14

The evidence also failed to support the Trustee's contention that Robson promised not to demand payment of the Amended MAP Note until DigitalBridge could close the Amended APA. Not only does this contention directly contradict the express provisions of the Amended MAP Note, but it is inconsistent with the other evidence presented. The Shein/Maines Email Exchange clearly evidences that Robson had discussed foreclosure on the Amended MAP Note as an alternative method to acquire the Healthcare Assets. Frankenberg and Maines testified that they were aware that the Amended MAP Note was a demand note. Frankenberg testified that this caused him concern, but failed to explain why. There would be little reason for him to be concerned that SKR Credit would foreclose if SKR Credit held a fourth lien position. If SKR Credit were in a fourth position, it would have had to satisfy all of the Equity Lenders' liens in order to acquire the Healthcare Assets free and clear.

The only modification to the MAP Note that was favorable to SKR Credit, and the only consideration given by DigitalBridge for the modification, was to change the payment date from a date certain to payment on demand, and yet Frankenberg and Maines testified that SKR Credit agreed to render this modification meaningless by agreeing not to foreclose. The testimony that Robson agreed not to foreclose, but only attempt to purchase the Healthcare Assets for $400,000, lacks credibility.

Even if Robson agreed that SKR Credit would not demand payment of the Amended MAP Note without advising the Board of his intention to demand payment, Shein's email to the Board satisfied the obligation to advise the Board. Robson advised the Board that he had been unsuccessful in his negotiations with Howard and was going to proceed with foreclosure.

There was also no evidence that the SKR Entities took unfair advantage of SKR Management's breach of the Management Agreement and insider knowledge to negotiate modifications of the SKR Agreements. The witnesses did not identify any insider knowledge acquired by SKR Management or how any insider information enabled Robson to take unfair advantage in the parties' negotiations. The only possible breach of the Management Agreement the witnesses identified was SKR Management's failure to pay the Required Payments or submit a proposal that was acceptable to the Board. Not only was SKR Management's liability limited by the Management Agreement, there is no evidence that this alleged breach caused any damage to DigitalBridge or gave Robson an unfair advantage to negotiate new agreements. DigitalBridge had been unable to pay the Required Payments before it entered into the SKR Management Agreement, and the only potential source for payment was the MAP Note, which was purely discretionary. There was no requirement that SKR Credit loan any funds. Because DigitalBridge was unable to perform under the APA, SKR Holdings had no contractual obligation to purchase the Healthcare Assets.

The reasonable inferences to be drawn from the written agreements are that Robson originally agreed to purchase the Healthcare Assets for $475,000 and, at his discretion, loan up to $500,000. When DigitalBridge failed to deliver the Healthcare Assets for that amount, Robson and the Board agreed to modify the agreements so that DigitalBridge could receive $300,000 to pay claims for which the Board members were personally liable. The evidence failed to support the Trustee's assertion that any of the SKR Entities made fraudulent representations in connection with the Amended SKR Agreements. The parol evidence, while considered by the Court, was not persuasive in light of the reasons stated previously.

16

**F. SKR Credit Makes a Demand for Payment and Robson Purchases the Healthcare Assets**

On September 23, 2010, SKR Credit sent a loan payment demand letter (Demand Letter) to DigitalBridge, demanding "payment for all principal and interest due under the [MAP Note and the Amended MAP Note] within ten (10) days of the date" of the Demand Letter.[11] On October 4, 2010, eleven days after the date of the Demand Letter, SKR Credit sent a notice of proposed disposition of collateral to DigitalBridge, notifying DigitalBridge that the collateral under the SKR Security Agreement was to be sold at a public auction on October 20, 2010.[12]

On October 18 and 19, 2010, DigitalBridge caused UCC financing statements to be filed in Delaware to perfect the Equity Lenders' secured interests.[13] On October 19, 2010, Kevin Howard, Phillip Adams, and Gregory Phillips (Petitioning Creditors), filed an involuntary petition against DigitalBridge.[14]

On November 2, 2010, under another asset purchase agreement (November APA), Robson, through SKR Holdings, negotiated the purchase of the Healthcare Assets from DigitalBridge for $10,000 subject to liens and encumbrances.[15] In connection with the November APA, DigitalBridge, SKR Credit, KDB, and Robson entered into an option agreement (Option Agreement) under which SKR Credit, KDB, and Robson granted DigitalBridge an "option to secure a release of [SKR Credit's, KDB's, and Robson's] lien on all of [DigitalBridge's assets],

---

[11] Docket No. 131, Final Pretrial Order, at 11.

[12] *Id.*

[13] *Id.* at 12.

[14] *Id.*

[15] *Id.*

with the exception of the Healthcare Assets."[16] To exercise the Option Agreement, DigitalBridge

was required to deliver "(1) a cash payment in the amount of $10,000; and (2) fully executed

releases in favor of [SKR Credit, KDB, Robson, and SKR Holdings], executed by the Petitioning

Creditors, [DigitalBridge], and [DigitalBridge's] principals in the form attached [to the Option

Agreement] as Exhibit H."[17] SKR Holdings paid the estate $10,000 for the Healthcare Assets

subject to all existing liens and encumbrances.

SKR Holdings has owned the Healthcare Assets since it acquired them under the

November APA.[18] The Healthcare Assets remain encumbered by the liens of SKR Credit, PGK,

FFT, and Uniti.[19] SKR Credit asserts to have, as of the date of the involuntary petition, a first-

priority security interest covering DigitalBridge's assets, including the Healthcare Assets, in the

principal amount of $384,486.97 plus $9,730.70 in interest under the MAP Note and the

Amended MAP Note.[20]

More than two years after the petition date, the Trustee commenced this adversary

proceeding. At trial, the Trustee failed to introduce meaningful evidence to support his valuation

of the Healthcare Assets. The only evidence of value introduced by the Trustee was the purchase

price of the Healthcare Assets as stated in the failed purchase agreements. The Trustee offered no

evidence with respect to the value of any other estate assets.

---

[16] *Id.*

[17] *Id.* at 12–13.

[18] *Id.* at 13.

[19] *Id.*

[20] *Id.* at 12.

## III. CONCLUSIONS OF LAW

### A. THE TRUSTEE'S SECOND AND FOURTH CLAIMS FOR RELIEF

The Trustee abandoned his second and fourth claims for relief and those claims will be dismissed.[21]

### B. THE TRUSTEE'S FIRST CLAIM FOR RELIEF

The Trustee's first claim for relief seeks a declaration that the estate has no liability under the MAP Note or the Amended MAP Note (collectively "MAP Notes") and SKR Credit may not enforce its security interest in the DigitalBridge assets. The Trustee contends that the funds DigitalBridge received from the SKR Entities were received from SKR Holdings, not SKR Credit, rendering the MAP Notes unenforceable because SKR Credit gave no consideration for them.

#### 1. Unity of SKR Entities

The evidence is clear that the SKR Entities were under Robson's control and that Robson and the SKR Entities were acting in concert to acquire the Healthcare Assets. The principals of DigitalBridge who interacted with the SKR Entities treated them all as the same entity, and Frankenberg and Maines testified that they, the Board, made no distinction between Robson and the SKR Entities. The Trustee contends that "SKR Credit's assertion that SKR Credit and SKR Holdings should be treated as one is in the nature of alter ego. Although it is undisputed that Robson (the principal of all of the SKR Entities) treated the SKR [E]ntities as instrumentalities of each other and of him, SKR Credit cannot rely on this fact to ignore their individual

---

[21] The Trustee's second claim sought avoidance and recovery of a software license as a fraudulent transfer, and his fourth claim sought to recharacterize loans made by the SKR Entities to DigitalBridge as equity.

existence."[22] The Trustee then advances the legal proposition that the Court can ignore the SKR

Entities' separateness when it benefits affected parties while—and without

contradiction—recognizing their separateness in other circumstances. Besides his reference to an

inapplicable court opinion,[23] the Trustee cites no legal authority for this bald assertion. There has

been no effort by either party to prove that the SKR Entities are Robson's alter egos. Even

though Robson and the SKR Entities should be viewed as separate entities, the Court will

attribute the actions of Robson and each of the SKR Entities to each other, not because they are

alter egos, but because the SKR Entities were under Robson's control and were acting in concert

for a common purpose. By accepting the funds from SKR Holdings, DigitalBridge adopted or

ratified[24] the payment by SKR Holdings as though it had been made by SKR Credit.[25]

## 2. Lack of Consideration

The Trustee cites selected language from Utah Code Ann. § 70A-3-303(2) as legal

authority for his claim that the MAP Notes are unenforceable. The Trustee's citation not only

omits relevant language under § 70A-3-303(2) but fails to mention relevant sections of § 70A-3-

303(1). Section 70A-3-303(2) states:

---

[22] Docket No. 142, Trustee's Amended Trial Brief, at 3.

[23] *In re Tuttle*, No. 05-26753, 2005 U.S. Bankr. LEXIS 1945 (Bankr. D. Utah Sept. 27, 2005).

[24] *See Cache Valley Banking Co. v. Logan Lodge No. 1453, B.P.O.E.*, 56 P.2d 1046, 1047–48 (Utah 1936) ("Ratification may be implied by acquiescence in, or recognition of, the act of the officers by the corporation or by acts tending to show an acceptance or adoption of the contract.").

[25] *See Swan Creek Village Homeowners Ass'n v. Warne*, 134 P.3d 1122, 1129 (Utah 2006) ("[W]e have relied on the principle of ratification to establish the validity of an act even though certain, express formalities have not been met.").

**"Consideration" means any consideration sufficient to support a simple
contract**. The drawer or maker of an instrument has a defense if the instrument is
issued without consideration. If an instrument is issued for a promise of
performance, the issuer has a defense to the extent performance of the promise is
due and the promise has not been performed. **If an instrument is issued for
value as stated in Subsection (1), the instrument is also issued for
consideration**.[26]

Section 70A-3-303(1) states in relevant part:

(1) An instrument is issued or transferred for value if:
    (a) the instrument is issued or transferred for a promise of performance, to the
extent the promise has been performed;
     . . . .

    (c) the instrument is issued or transferred as payment of, or as security for, an
antecedent claim against any person, whether or not the claim is due.[27]

It is undisputed, and in fact acknowledged by the Trustee's witnesses, that

DigitalBridge received funds from the SKR Entities as a result of, and pursuant to, the MAP

Notes, and there was no evidence that the funds were advanced for any other purpose. Robson's

September 16, 2010 email clearly stated that the $300,000 wire constituted the entire required

payment under the Amended MAP Note. The MAP Note states "For value received,

DigitalBridge Holdings, Inc., . . . promises to pay to the order of SKR Credit, LTD." The Board

clearly intended that the MAP Notes obligate DigitalBridge to repay the borrowed funds. There

was not any evidence that the parties agreed that the funds DigitalBridge received must come

directly from SKR Credit. Maines testified that it did not matter to the Board whether the funds

were advanced directly from SKR Credit or its parent company, SKR Holdings.

---

[26] Utah Code Ann. § 70A-3-303(2) (emphasis added).

[27] Utah Code Ann. § 70A-3-303(1).

21

DigitalBridge received value and in exchange promised to pay SKR Credit. The MAP

Notes were issued with consideration sufficient to support a simple contract. No other entity or

person asserts a right to payment for the funds DigitalBridge received pursuant to the MAP

Notes. Because the SKR Entities were acting in concert and the Board made no distinction

among them, it is immaterial whether the funds came from SKR Holdings or SKR Credit.

## C. THE TRUSTEE'S THIRD CLAIM FOR RELIEF

The Trustee's Third Claim for Relief seeks to recover the alleged claims against SKR

Management that were released by DigitalBridge. The Trustee asserts "this claim for the sole

purpose of preserving his claim for equitable subordination" and concedes that "this claim may

be dismissed as superfluous if it is not needed to support such [a] claim."[28] The equitable

subordination claim the Trustee is asserting is not dependent on avoiding DigitalBridge's release

of claims against SKR Management. Claims for equitable subordination under

11 U.S.C. § 510(c)[29] are creditor-based claims, not debtor-based claims. A release of claims by

the debtor does not affect or prejudice claims that creditors may have for equitable subordination.

The Court will therefore dismiss the Trustee's Third Claim for Relief as superfluous.

Additionally, the Trustee has failed to carry his burden under § 548. In his third claim for

relief, the Trustee seeks to avoid the release of claims against SKR Management contained in the

Termination Agreement as a fraudulent transfer.[30] The Trustee contends that he may avoid the

---

[28] Docket No. 142, Trustee's Amended Trial Brief, at 6.

[29] Unless otherwise noted, all subsequent statutory references are to Title 11 of the United States Code.

[30] Docket No. 16, Trustee's Second Amended Complaint, at 14–15.

transfers because DigitalBridge released substantial claims against SKR Management for breach of the Management Agreement and received less than reasonably equivalent value in exchange for the release. The Trustee's claim fails, however, because the released claims that he seeks to recover have no value.

The Trustee bears the burden of proof in establishing that DigitalBridge received less than reasonably equivalent value in exchange for the release.[31] The breaches the Trustee identified were SKR Management's breach of its fiduciary duty by failing to disclose the Perfection Issue and its breach of the Management Agreement by failing to resolve the Required Payments by either drawing on the MAP Note or submitting a proposal, acceptable to the Board, for the deferred and/or structured satisfaction of the Required Payments. The Trustee has not asserted, much less proved, a breach of contract claim. He simply asks this Court to conclude that SKR Management breached the Management Agreement.

Assuming for purposes of analysis only that SKR Management had a fiduciary duty to disclose the Perfection Issue, the only consequence of this alleged breach of duty was the failure to perfect the Equity Lenders' secured interest. But the alleged failure to disclose the Perfection Issue and the failure to perfect the Equity Lenders' interest caused no injury to DigitalBridge. Therefore, this claim had no value.

The same is true of the claim for breach of the Management Agreement. Advances under the MAP Note were subject to Robson's absolute discretion, and SKR Management and SKR Credit were controlled by Robson. The Trustee's contention that SKR Management's technical

---

[31] *Weinman v. Walker (In re Adam Aircraft Indus., Inc.)*, 493 B.R. 834, 845 (Bankr. D. Colo. 2013) (citing *Jobin v. McKay (In re M & L Bus. Mach. Co.)*, 155 B.R. 531, 534 (Bankr. D. Colo. 1993)).

failure to request a draw on the MAP Note was a breach of the Management Agreement borders

on the ridiculous. Given the express limitations on SKR Management's liability, which covered

the failure to fund, pay, or meet any of DigitalBridge's obligations, SKR Management's failure to

make a meaningless request exposed SKR Credit to no liability. In sum, any claims arising from

the alleged breach of the Management Agreement were of little or no value. The Trustee failed to

meet his burden to show that DigitalBridge received less than reasonably equivalent value in

exchange for the release it provided to SKR Management in executing the Termination

Agreement.

## D. THE TRUSTEE'S FIFTH AND SIXTH CLAIMS FOR RELIEF

The Trustee's fifth claim for relief seeks equitable subordination of SKR Credit's secured

claim to those of unsecured creditors and the Equity Lenders.[32] His sixth claim seeks to avoid

SKR Holdings' purchase of the Healthcare Assets as an unauthorized post-petition transfer under

§ 549(a) and recover its value under § 550(a).[33] These two claims are interrelated. The Trustee's

theory of his case is set forth in the final few paragraphs of his Amended Trial Brief. The Trustee

seeks a judgment against SKR Holdings in the amount of $390,000 and subordination of SKR

Credit's lien. The Trustee asserts that "[e]ven if SKR Credit's lien[34] is not subordinated, this

judgment will allow . . . the Trustee to pay off (or pay down) SKR Credit's lien[,] leaving the

---

[32] Docket No. 142, Trustee's Amended Trial Brief, at 11–12; *see also* Docket No. 16, Trustee's Second Amended Complaint, at 19.

[33] Docket No. 142, Trustee's Amended Trial Brief, at 24.

[34] In his briefing, the Trustee equates subordination of claims with the subordination of liens. Section 510(c) clearly does not allow for the subordination of liens but does provide that any lien securing a subordinated claim may be transferred to the estate.

remainder of the estate's assets[35] subject only to the three junior lien claims—the holders of

which have stipulated are avoidable as preferences under § 547 and which are preserved for the

benefit of the estate under § 551."[36]

### 1. The Trustee's Theory of Recovery Is Fundamentally Flawed

The Trustee's case is predicated on the following: (1) recovering the alleged value of the

Healthcare Assets under § 550(a), and (2) equitably subordinating SKR Credit's lien under

§ 510(c). There are two major flaws in the Trustee's theory. The first flaw is that he seeks

subordination of liens that do not exist. When a trustee recovers the "value" of transferred

property under § 550(a), as opposed to the transferred property itself,[37] there is no basis for a

creditor to assert a lien in the "value" recovered. Section 550(e)(1)(A) specifically provides that a

good faith transferee has a lien on "property recovered" if the transferee paid a debt secured by a

lien on such property, but there is no similar provision allowing a lien on the "value" recovered

by the trustee. Liens that were attached to property at the time of transfer and remain unsatisfied

continue to be liens against the transferred property and are unaffected by the trustee's recovery

of the "value." It clearly would be inequitable to permit a creditor to enjoy a double recovery by

retaining a lien in transferred property that was not recovered by the trustee and also be allowed a

lien in the "value" recovered by the trustee. If the Trustee recovers the "value" of the Healthcare

Assets, the Trustee does not recover property, and there are no liens to subordinate.

---

[35] The assertion that there are other valuable estate assets seems disingenuous since the Trustee failed to identify or offer any evidence of other estate assets.

[36] Docket No. 142, Trustee's Amended Trial Brief, at 28-29.

[37] If a trustee successfully avoids a transfer, under § 550, the trustee may recover either the transferred property or the trustee may recover its value. *Rodriguez v. Drive Fin. Servs., L.P. (In re Trout)*, 609 F.3d 1106, 1111 (10th Cir. 2010).

The Trustee's theory is also flawed because his § 510(c) claim and § 550(a) claim are mutually dependent and circular in nature—each is the condition precedent of the other. The Trustee must first prevail on his § 550(a) claim in order to prevail on his § 510(c) claim, but he must first prevail on his § 510(c) claim in order to prevail on his § 550(a) claim. Section 510(c) applies if there will be a distribution, and according to the Trustee, there will be a distribution and § 510(c) will be applicable if SKR Holdings is required to pay the value of the Healthcare Assets under § 550(a). At the same time, however, the Trustee's theory demands that SKR Holdings be required to pay the value of the Healthcare Assets under 550(a) only if SKR Credit's lien is first equitably subordinated under § 510(c), thereby creating value. In other words:

Section 510(c) creates values and applies because § 550(a) creates a distribution.

Section 550(a) creates a distribution and applies because § 510(c) creates value.

In addition to the problems with this line of reasoning, the Trustee is mistaken when he asserts that subordinating SKR Credit's lien will create value. Subordinating or reordering liens does not create value. Even if reordered, the liens remain; they are simply placed in a different order.[38] What the Trustee characterizes as value is nothing more than a benefit the Trustee seeks to receive because of the happenstance of bankruptcy.[39]

---

[38] For example, if the Trustee were seeking to recover the Healthcare Assets, no "value" is created by re-prioritizing the liens. The Trustee would simply benefit by being able to assert the Equity Lenders' liens as provided in § 551.

[39] *See Butner v. United States*, 440 U.S. 48, 55 (1979) ("Uniform treatment of property interests by both state and federal courts within a State serves to reduce uncertainty, to discourage forum shopping, and to prevent a party from receiving a windfall merely by reason of the happenstance of bankruptcy.") (internal quotation marks omitted); *Lewis v. Mfrs. Nat'l Bank of Detroit*, 364 U.S. 603, 608 (1961) (rejecting a construction of the former Bankruptcy Act that "would enrich unsecured creditors at the expense of secured creditors, creating a windfall merely by reason of the happenstance of bankruptcy").

### 2. The Trustee Has Failed to Establish the Elements of Equitable Subordination

"[E]quitable subordination is an extraordinary remedy to be employed by courts sparingly. 'Wrongful or unpredictable subordination spawns legal uncertainty of a particular type: the risk that a court may refuse to honor an otherwise binding agreement on amorphous grounds of equity.'"[40] Three conditions must be satisfied before equitable subordination is appropriate: "(1) 'inequitable conduct' on the part of the claimant sought to be subordinated; (2) injury to the other creditors of the bankrupt or unfair advantage for the claimant resulting from the claimant's conduct; and (3) consistency with the provisions of the Bankruptcy Code."[41] The first of these requirements, inequitable conduct, "encompasses three categories of misconduct: (1) fraud, illegality, and breach of fiduciary duties; (2) undercapitalization; or (3) claimant's use of the debtor as a mere instrumentality or alter ego."[42] "Where the claimant is an insider or a fiduciary, the party seeking subordination need only show some unfair conduct, and a degree of culpability, on the part of the insider. If the claimant is not an insider or a fiduciary, however, the party seeking subordination must demonstrate even more egregious conduct such as gross misconduct tantamount to fraud, misrepresentation, overreaching or spoliation."[43]

---

[40] *Redmond v. Jenkins (In re Alternate Fuels, Inc.)*, 789 F.3d 1139, 1154 (10th Cir. 2015) (quoting *In re Lifschultz Fast Freight*, 132 F.3d 339, 347 (7th Cir. 1997)). The Tenth Circuit also referred to equitable subordination as an "extreme remedy." *Id.* at 1156.

[41] *Sender v. Bronze Group, Ltd. (In re Hedged-Investments Assocs., Inc.)*, 380 F.3d 1292, 1300 (10th Cir. 2004) (citation omitted).

[42] *Id.* at 1301 (citation and internal quotation marks omitted).

[43] *Id.* at 1301–02 (citations and internal quotation marks omitted).

27

The claim the Trustee seeks to subordinate in this case arises from a contemporaneous exchange of new value. Under the terms of the Amended MAP Note, SKR Credit received a claim in an amount equal to the funds it loaned to DigitalBridge. The MAP Notes are binding agreements and should be honored unless the Trustee can clearly establish inequitable conduct by the SKR Entities. The inequitable conduct the Trustee alleges is not supported by the evidence. The Trustee's version, which is contrary to the written agreements, is that Robson rejected an offer to purchase the Healthcare Assets for $945,000 but nevertheless entered into agreements whereby Robson's entities would pay $975,000 for the same assets. The Trustee contends that Robson verbally agreed to purchase the Healthcare Assets for $475,000 and to loan DigitalBridge an additional $500,000. Knowing DigitalBridge could not repay the loan, Robson agreed that he would not enforce the loan. So, to avoid paying $975,000, Robson took advantage of SKR Management's breach of the Management Agreement and fraudulently induced DigitalBridge to modify the SKR Agreements so he could obtain the Healthcare Assets for approximately $400,000.

In fact, the evidence established that SKR Credit had no obligation to loan any funds, SKR Holdings had no obligation to purchase the Healthcare Assets, and SKR Management had no liability for its alleged breach of the Management Agreement. Robson did not need to amend the SKR Agreements to obtain a first position lien but could have simply loaned funds under the original MAP Note. The reason the Board members signed the Amended SKR Agreements was because they desperately wanted to limit their personal liability, not because the SKR Entities acted inequitably.

**(a) There Was No Inequitable Conduct on the Part of the SKR Entities**

"In order to make a *prima facie* showing of inequitable conduct, [the Trustee] must

present material evidence of unfair conduct, and demonstrate some culpability on [the SKR

Entities'] part."[44] The Trustee asserts there are three instances of inequitable conduct that support

equitable subordination: (1) SKR Credit failed to inform the Board of the Perfection Issue; (2)

SKR Credit took advantage of SKR Management's purported breach of the Management

Agreement to secure favorable modifications to the MAP Note; and (3) SKR Credit made

fraudulent representations to induce the Board to modify the MAP Note. None of the alleged

instances of inequitable conduct are supported by the evidence.

**(i) Robson Disclosed the Perfection Issue**

The Trustee argues that the Management Agreement made Robson and the SKR Entities

insiders and fiduciaries of DigitalBridge and they therefore had a duty to disclose the Perfection

Issue to the Board. The Court does not need to determine whether Robson and the SKR Entities

had such a duty because the evidence is that Robson did disclose the Perfection Issue to the

Board. But in addition to that fact, the Court finds that no such duty to disclose arose under the

Management Agreement, which specifically enumerated SKR Management's fiduciary

obligations. They did not encompass the duty to disclose the Perfection Issue.

The Trustee has not specified the relevant time frame of SKR Management's fiduciary

duties but, correctly, he does not claim that SKR Management had any fiduciary duty prior to the

execution of the Original SKR Agreements. Moreover, although the Trustee asserts that SKR

Management was a fiduciary because it had complete control of DigitalBridge, he has not

---

[44] *Id.* at 1302 (internal quotation marks omitted).

specifically identified the source of its duty to disclose the Perfection Issue, and it is not clear

whether the Trustee asserts a fiduciary relationship based on contract or one "implied in law due

to the factual situation surrounding the involved transactions and the relationship of the parties to

each other and to the questioned transactions."[45]

It is clear, however, that SKR Management's fiduciary duties are precisely defined by the

Management Agreement, which provides that "[t]he Company and Manager understand,

acknowledge and agree that, **except for the specific contractual obligations of Manager set**

**forth in this Agreement, Manager shall have no fiduciary or similar obligation to the**

**Company, its Board of Directors or its shareholders**." (emphasis added). Because of this

express limitation on SKR Management's fiduciary duties, the Court concludes that its fiduciary

duties were based solely on contract; the Management Agreement itself eliminates the possibility

of extra-contractual fiduciary duties.

The discrete duties and responsibilities prescribed by the Management Agreement did not

include advising the Board with respect to DigitalBridge's indebtedness or issues relating thereto.

Section 3.b. of the Management Agreement specified SKR Management's duties and

responsibilities. And Section 4 of the Management agreement expressly provided that SKR

Management "shall not . . . without the prior written consent of the Company's Board of

Directors" obtain financing in excess of $10,000 or encumber DigitalBridge's assets. Although

the control given to SKR Management under the Management Agreement was broad, SKR

Management had no fiduciary duties other than those specified, and the Board retained control

over specific actions, including encumbering assets.

---

[45] *Rajala v. Allied Corp.*, 919 F.2d 610, 614 (10th Cir. 1990) (citation and internal
quotation marks omitted).

30

**(ii) The Trustee Failed to Prove That Any Inequitable Conduct Resulted from SKR Management's Alleged Breach of the Management Agreement**

The Trustee did not assert a cause of action against SKR Management for breach of contract or attempt to establish any damages but simply asks this Court to conclude that (1) SKR Management breached the Management Agreement and (2) regardless of any damages, the breach was culpable and unfair conduct. The only alleged breach of the Management Agreement the Trustee identifies is SKR Management's failure to "either: (i) draw on the [MAP Note] and utilize the proceeds (together with the Company's then existing cash resources) to satisfy the specific Company obligations listed on Schedule 1 to [the Management Agreement] (collectively, 'Required Payments') or (ii) submit a proposal acceptable to the Company's Board of Directors providing for the deferred and/or structured satisfaction of the Required Payments."[46]

SKR Management's liability under the Management Agreement was expressly limited by Paragraph 9.b. of the Management Agreement. SKR Management had no liability for SKR Credit's failure to fund any DigitalBridge expense or DigitalBridge's failure to meet its obligations. The assertion that SKR Management's failure to request that SKR Credit fund the Required Payments was a meaningful breach of the Management Agreement is disingenuous. The SKR Entities were under Robson's control, and Robson's alleged failure to go through the formality of asking himself to advance funds knowing his answer would be no—and knowing that there would be no liability for refusing to advance the funds—was not a significant breach of the Management Agreement.

---

[46] Docket No. 142, Trustee's Amended Trial Brief, at 19.

31

Although the Board members testified that it was important to them that the Required

Payments be made, they did not articulate how SKR Management's failure to request a draw on

the MAP Note, which was subject to Robson's discretion, or submit a proposal providing for

deferred or structured satisfaction of the Required Payments enabled the SKR Entities to secure

unfair or inequitable modifications to the SKR Agreements. Even the Trustee failed to articulate

how this alleged breach, for which there was no liability, enabled the SKR Entities to secure

unfair modifications to the Original SKR Agreements.

### (iii) Alleged Fraud in Negotiating Amendments

The Trustee has failed to establish any fraudulent representation in connection with the

Amended SKR Agreements. Although the Court was liberal in permitting parol evidence, the

Court is unpersuaded that the Amended SKR Agreements contain any ambiguities or that the

express terms of the Amended SKR Agreements should be ignored. The Trustee did not even

allege that there were ambiguities in the Amended SKR Agreements, but simply asserts that

Robson made a promise that was inconsistent with the terms of the Amended SKR Agreements.

The testimony the Trustee relied on is not credible. As set forth in the factual findings,

DigitalBridge was aware that SKR Credit would be in a first position and that SKR Credit would

be able to foreclose on the Healthcare Assets if SKR Credit made a demand for payment.

There was no need for Robson to amend the Original SKR Agreements for him to

accomplish what the Trustee has accused him of doing. SKR Credit, knowing it was in first

position at the time the MAP Note was executed could have, in its sole discretion, loaned any

amount up to $500,000 to enable it to acquire the Healthcare Assets by foreclosure, but only

loaned an additional $38,775.97 under the MAP Note. This amount was hardly sufficient for the

SKR Entities to obtain an unfair advantage. If Robson wanted to obtain the Healthcare Assets for

less than their market value, he could have simply advanced money under the MAP Note and

foreclosed when the MAP Note went into default. This fact is contrary to the Trustee's

contention that Robson was somehow attempting, via the Amended SKR Agreements, to obtain

the Healthcare Assets through foreclosure at a reduced price. The evidence is straightforward:

DigitalBridge could not deliver the Healthcare Assets free of liens for $475,000 and Robson was

unwilling to lend any additional funds. The Board was desperate for funds, and the agreements

were renegotiated so that DigitalBridge would receive $300,000 and Robson would be able to

foreclose if DigitalBridge could not deliver the Healthcare Assets free of liens for $400,000.

**(b) The Alleged Inequitable Conduct Caused No Injury to Unsecured Creditors nor Gave the SKR Entities an Unfair Advantage**

Even if the facts were as the Trustee alleges, they fail to establish any injury to

DigitalBridge's creditors. But more problematic for the Trustee is that the facts are not as he

alleges.

**(i) The Alleged Failure to Disclose the Perfection Issue Did Not Injure the Unsecured Creditors**

DigitalBridge received $371,987.97 and in exchange gave SKR Credit a lien in an equal

amount. Receiving a secured interest in a contemporaneous exchange for equal value does not

cause injury.[47] The alleged failure to disclose the Perfection Issue to the Equity Lenders caused

---

[47] "The primary consideration in analyzing the exchange of value for any transfer is the degree to which the transferor's net worth is preserved." *Klein v. Cornelius*, 786 F.3d 1310, 1321 (10th Cir. 2015). As such, a dollar-for-dollar exchange (e.g., cash for secured note) preserves the transferor's net worth entirely.

no injury to unsecured creditors. The Trustee contends that the Board entered into the Amended

SKR Agreements because they believed SKR Credit would be in a fourth position. In other

words, the Board believed there would be liens totaling $797,787.77. Assuming the Board would

have corrected the Perfection Issue, as argued by the Trustee, and assuming SKR Credit would

have loaned the funds, the result would be the same. The actual result, even assuming SKR

Management breached a fiduciary duty, was that there was a lien of only $371,987.97. This

result clearly did not injure DigitalBridge's unsecured creditors.

The Trustee also argues that SKR Credit obtained an unfair advantage by failing to

disclose the Perfection Issue. Specifically, the Trustee argues that SKR Credit was able to obtain

the Healthcare Assets without paying the Equity Lenders' claims. The Perfection Issue is of no

consequence to unsecured creditors. If the Equity Lenders' interests had been perfected, any

proceeds from the Healthcare Assets would have gone to the Equity Lenders, not to the Debtor or

the Debtor's estate.

**(ii) The Alleged Breach of the Management Agreement Did Not Give the SKR
Entities an Unfair Advantage or Injure Unsecured Creditors**

SKR Credit had no obligation to loan any funds to DigitalBridge and SKR Management

had no liability for its failure to pay DigitalBridge's expenses. Although SKR Management did

not make a request pursuant to the Management Agreement, SKR Credit did eventually advance

an additional $300,000, which was used to make some of the Required Payments.

**(iii) The Alleged Misrepresentation Did Not Injure Unsecured Creditors**

Even if SKR Credit fraudulently represented that it would not foreclose on its secured

interest, these actions caused no injury to unsecured creditors. The Trustee argues, without any

34

evidentiary support, that SKR Credit's premature foreclosure prevented DigitalBridge from successfully selling the Healthcare Assets. The actual evidence is to the contrary. The Board members testified that DigitalBridge had been unsuccessful in its efforts to sell the Healthcare Assets prior to SKR Holding's offer. The Trustee's position that creditors were injured because DigitalBridge was not given three and one-half more months to sell the Healthcare Assets is pure speculation. As previously stated, the only evidence of value the Trustee relies on is the purchase price in the failed purchase agreements. This evidence does not support a value in excess of $400,000. SKR Credit held a lien in excess of $394,000 when SKR Holdings paid $10,000 for the Healthcare Assets. Even ignoring the Equity Lenders' liens, there was no equity in the Healthcare Assets that may have benefitted DigitalBridge or the unsecured creditors.

### 3. SKR Credit's Lien Cannot Be Subordinated to the Equity Lenders' Liens

The Trustee also seeks to equitably subordinate SKR Credit's properly perfected lien to the Equity Lenders' liens. The Trustee uses the terms "claim" and "lien" interchangeably,[48] but there is a clear difference. Although a lien securing a subordinated claim may be transferred to the estate under § 510(c)(2),[49] only claims may be subordinated under § 510(c)(1).[50] "The fact that . . . a claim may be secured is of no consequence to the issue of [claim] subordination."[51]

---

[48] *See, e.g.,* Docket No. 142, Trustee's Amended Trial Brief, at 11–12, 24.

[49] Although the Trustee has not specifically requested that SKR Credit's lien be transferred to the estate, the Court will view the Trustee's claim for equitable subordination to include a request for that relief.

[50] *See* H.R. Rep. No. 95-595 (1978), *as reprinted in* 1978 U.S.C.C.A.N. 5963, 6452.

[51] *Id.*

If SKR Credit's claim should be equitably subordinated, its lien should be transferred to the estate and subordination to the Equity Lenders' liens is unnecessary.

### (a) The Trustee Lacks Standing to Assert the Equity Lenders' Claims

Because "[t]he federal courts are under an independent obligation to examine their own jurisdiction, and standing is perhaps the most important of the jurisdictional doctrines,"[52] the Court will first address the Trustee's standing to pursue subordination on behalf of the Equity Lenders. "The case-or-controversy doctrines state fundamental limits on federal judicial power in our system of government. The Art. III doctrine that requires a litigant to have 'standing' to invoke the power of a federal court is perhaps the most important of these doctrines. . . . Standing doctrine embraces several judicially self-imposed limits on the exercise of federal jurisdiction, such as the general prohibition on a litigant's raising another person's legal rights . . . and the requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked."[53]

"The Trustee is ordinarily the appropriate party to seek equitable subordination on behalf of the estate and unsecured creditors."[54] "If a claim is a general one, with no particularized injury arising from it, and if that claim could be brought by any creditor of the debtor, the trustee is the proper person to assert the claim, and the creditors are bound by the outcome of the trustee's

---

[52] *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990) (citation and internal quotation marks omitted).

[53] *Allen v. Wright*, 468 U.S. 737, 750–51 (1984) (citation omitted), *reh'g denied*, 468 U.S. 1250 (1984), *abrogated on other grounds by Lexmark Int'l, Inc. v. Static Control Components, Inc.*, --- U.S. ----, 134 S. Ct. 1377 (2014).

[54] *Bezanson v. Bayside Enters., Inc. (In re Medomak Canning)*, 922 F.2d 895, 902 (1st Cir. 1990).

36

action."[55] Similarly, "where the inequitable conduct injures the estate as a whole, the trustee is

the person with the standing to assert it. A creditor may bring an equitable subordination claim

only if he can allege a particularized injury resulting from the defendant's inequitable conduct."[56]

But "[a]n injured secured creditor should be permitted to pursue its separate interest apart from

the trustee. . . . [A] secured creditor has standing to seek the equitable subordination of another

secured creditor's claim to the extent that it seeks relief for a particularized injury, which differs

from the injury incurred by all creditors."[57]

A "particularized injury is an injury significantly different from the injuries to creditors in

general."[58] The general/particularized distinction is another way of asking whether the estate or

the individual creditor holds the claim.[59] In the context of a § 523 action brought by a trustee, one

court stated that "the trustee has no standing to bring *personal* claims of creditors. A cause of

---

[55] *St. Paul Fire & Marine Ins. Co. v. PepsiCo, Inc.*, 884 F.2d 688, 701 (2d Cir. 1989).

[56] *Picard v. Merkin (In re Bernard L. Madoff Inv. Sec. LLC)*, 515 B.R. 117, 159 (Bankr. S.D.N.Y. 2014) (citations omitted).

[57] *Elway Co., LLP v. Miller (In re Elrod Holdings Corp.)*, 392 B.R. 110, 115 (Bankr. D. Del. 2008). For this reason, unsecured creditors' committees, due to their collective nature and "close identity of interests with the debtor-in-possession insofar as the [DIP] is obligated to pursue all actions that are in the best interest of the creditors and the estate," will usually be unable to allege the type of particularized injury necessary to bring an equitable subordination claim on their own behalf. *See Official Comm. of Unsecured Creditors of AppliedTheory Corp. v. Halifax Fund, L.P. (In re AppliedTheory Corp.)*, 493 F.3d 82, 86–87 (2d Cir. 2007).

[58] *Lyme Regis Partners, LLC v. Icahn (In re Blockbuster, Inc.)*, Adv. No. 10-05524 (BRL), 2011 WL 1042767, at *2 (Bankr. S.D.N.Y. Mar. 17, 2011) (citation and internal quotation marks omitted).

[59] *See Solow v. Stone*, 994 F. Supp. 173, 178 (S.D.N.Y. 1998); *Variable-Parameter Fixture Dev. Corp. v. Comerica-Bank Cal. (In re Morpheus Lights, Inc.)*, 228 B.R. 449, 453 (Bankr. N.D. Cal. 1998).

action is 'personal' if the claimant himself is harmed and no other claimant or creditor has an interest in the cause. But allegations that could be asserted by any creditor could be brought by the trustee as a representative of all creditors."[60] While it is clear that a trustee can bring a general equitable subordination claim on behalf of the estate as a whole, and individual creditors can assert equitable subordination claims if they allege particularized injury, a trustee cannot assert an equitable subordination claim on behalf of individual creditors. The Trustee lacks standing in this case to the extent he is asserting another person's legal rights, namely those of the Equity Lenders concerning their claim for a particularized injury.

The Trustee has avoided the Equity Lenders' liens, and he asserts that he has standing because these avoided liens are preserved for the benefit of the estate pursuant to § 551. It is clear that § 551 preserves, for the benefit of the estate, any transfer, "including the creation of a lien," that is avoided under § 547. The Equity Lenders' claim for equitable subordination is based on an alleged injury to three specific secured creditors. Even if the Equity Lenders were damaged by DigitalBridge's failure to timely perfect their liens, only their avoided liens can be preserved for the benefit of the estate, nothing more. The Trustee has not succeeded to all claims the Equity Holders may have. The Trustee clearly has standing to litigate the validity and priority of the avoided Equity Lender liens, but he does not have standing to assert the Equity Lenders' claims for damages arising from the Debtor's breach of its obligations or SKR Management's alleged inequitable conduct.

The Trustee argues that he has standing because the Equity Lenders have assigned their claims for equitable subordination to him. Ignoring the propriety of a Trustee pursuing third party

---

[60] *Barber v. Martin (In re Martin)*, 154 B.R. 490, 493 (Bankr. C.D. Ill. 1993) (quoting *Koch Refining v. Farmers Union Cent. Exch., Inc.*, 831 F.2d 1339, 1348–49 (7th Cir. 1987)).

38

claims, the settlement agreement the Trustee relies on does not assign the claims the Trustee is

asserting. The Trustee relies on paragraph 3 of the Settlement and Assignment Agreement, which

provides:

> <u>Assignment</u>. The Creditor **agrees to assign**, and does hereby assign, **the Security
> Interest** to the Trustee, **together with any rights, title and interest arising out
> of the Security Interest** that Creditor may have, under the Bankruptcy Code or
> state law, with respect to other creditors of the Debtor's bankruptcy estate.
> Creditor, however, **does not assign any rights or interests** it may have under any
> insurance policy that may cover Creditor's loss of perfection/or priority **as a
> result of the Debtor's failure to properly perfect the Security Interest.**

(emphasis added). This assignment gives the Trustee no more than he has under § 551. He may

assert the Equity Lenders' security interests and rights pursuant to the security interests, but he

does not have standing to assert their personal claims for a particularized injury.

**(b) The Equity Lenders Have no Claim Under § 510(c)**

Even if the Trustee has standing to bring the Equity Lenders' claims, they have no claims

under § 510(c). As set forth above, there was no inequitable conduct on the part of the SKR

Entities. The Perfection Issue was disclosed to the Board before the $330,000 was advanced. The

SKR Entities did not owe a fiduciary duty to the Equity Lenders and did not make any

representations to the Equity Lenders. The fact that SKR Credit obtained a first-position lien in

an amount equal to funds it advanced in a contemporaneous exchange of value does not equate to

an unfair advantage justifying equitable subordination of SKR Credit's claim to lenders who

failed to perfect their secured interests in a timely fashion.

Although one secured creditor may have a claim against another under non-bankruptcy

law,[61] the Trustee is not asserting the Equity Lenders' claim under non-bankruptcy law. The

---

[61] In fact, Utah Code Ann. §70A-1a-103 specifically recognizes this fact.

Trustee has not even attempted to articulate any claim under non-bankruptcy law. He is

attempting to do exactly what the Tenth Circuit has cautioned against—using "amorphous

grounds of equity" to invalidate binding agreements.[62] Essentially, the Trustee's contention is

that § 510(c) authorizes this Court to equitably prioritize liens to protect the legal interests of

secured creditors who have failed to protect their own legal interests. A claim is a right to

payment;[63] it is not a lien. A lien secures the right to payment, and § 510(c) addresses the right to

payment, not the lien. Section 510(c) allows bankruptcy courts to subordinate all or part of an

allowed claim to all or part of another allowed claim. This section does not permit the court to

subordinate or prioritize liens.

    Equitable subordination is, as its name makes clear, an equitable remedy, and principles

of equity apply. "[W]herever the rights or the situation of parties are clearly defined and

established by law, equity has no power to change or unsettle those rights or that situation."[64]

Priority of secured interests is controlled by the extensive statutory provisions of Article 9 of the

Uniform Commercial Code (UCC), which has been adopted by the State of Utah,[65] and the

Court's exercise of its equitable powers must be consistent with the provisions of the UCC.

"Equity aids the vigilant, not those who slumber on their rights."[66] Application of this maxim of

---

[62] *See Alternate Fuels*, 789 F.3d at 1154.

[63] § 101(5).

[64] *Hedges v. Dixon County*, 150 U.S. 182, 192 (1893) (citation and internal quotation
marks omitted).

[65] Utah Code Ann. §70A-9a-101 *et seq.*

[66] *Standard Oil Co. of N.M., Inc. v. Standard Oil Co. of Cal.*, 56 F.2d 973, 975 (10th Cir.
1932) (citations omitted).

equity "den[ies] relief to one whose danger was created by his own neglect."[67] "Equity will not

assist a man whose condition is attributable only to that want of diligence which may be fairly

expected from a reasonable person."[68] "There must be conscience, good faith, and reasonable

diligence, to call into action the powers of the court."[69] Although DigitalBridge had a contractual

duty to file the Equity Lenders' financing statements, that fact did not absolve the Equity Lenders

from protecting their own legal rights. It was the Equity Lenders' failure to insure that

DigitalBridge performed its contractual obligation that resulted in their loss of lien priority.

The SKR Entities had no contractual or fiduciary duty to the Equity Lenders, made no

representations to the Equity Lenders, and properly perfected SKR Credit's security interest

before the Equity Lenders'. There is simply no basis for this Court to equitably subordinate SKR

Credit's lien in derogation of the express provisions of the UCC and the Equity Lenders' failure

to protect their own interest.

### 4. Section 510(c) Has No Application in This Case

By its express language, § 510(c) is only applicable "for purposes of distribution" to

allowed claims.[70] The Trustee is not proposing a distribution to general unsecured creditors. It is

not only inappropriate for the Court to equitably subordinate claims if there is no distribution, but

it is also meaningless.

---

[67] *In re Sheerer's Estate*, 289 N.W. 529, 534 (Neb. 1940).

[68] *Upton v. Tribilcock*, 91 U.S. 45, 55 (1875).

[69] *Holmberg v. Armbrecht*, 327 U.S. 392, 396 (1946) (citation and internal quotation marks omitted).

[70] *See Sloan v. Zions First Nat'l Bank (In re Castletons, Inc.)*, 990 F.2d 551, 559 (10th Cir. 1993).

41

Section 510(c) only allows a court to subordinate an *allowed* claim. "[T]he existence of a lien is not tantamount to an allowed claim within the meaning of 11 U.S.C. § 502 and a secured creditor may choose to forego participation in a bankruptcy proceeding, electing to enforce its lien rights in state court."[71] If a proof of claim has not been filed, the claim is not subject to equitable subordination. "Only an 'allowed claim' (or an 'allowed interest') may be subjected to equitable subordination under Bankruptcy Code § 510(c). *Unless a claim has been filed it may not be allowed*."[72]

The situation here differs from cases where the Trustee avoids a transfer and recovers the transferred property. Any liens on the property recovered must be satisfied prior to distribution to unsecured creditors. If the secured creditor's claim is subordinated and the lien is transferred to the estate, then the estate is entitled to the benefit of the lien. The transfer of the Healthcare Assets had no effect on SKR Credit's lien or the Equity Lenders' liens because those liens remained in spite of the transfer. The Equity Lenders are not entitled to an additional lien on any value the Trustee recovers. Because the Trustee is simply seeking to recover the value of property transferred, as opposed to the property, the liens are meaningless for purposes of distribution. Any "claim" they may have would be unsecured. In this case, the Equity Lenders do not have an allowed claim and the Trustee is not proposing any distribution. Section 510(c) simply does not apply here.

---

[71] *In re Elmont Elec. Co.*, 206 B.R. 41, 44 (Bankr. E.D.N.Y. 1997).

[72] *Max Sugarman Funeral Home, Inc. v. A.D.B. Inv'rs*, 926 F.2d 1248, 1257 n.16 (1st Cir. 1991) (emphasis added); *see also Tronox Inc. v. Anadarko Petroleum Corp. (In re Tronox Inc.)*, 429 B.R. 73, 109 (Bankr. S.D.N.Y. 2010) ("The great weight of authority is that 'Section 510(c) does not permit subordination absent an allowed claim.'").

**5. Because There Is No Value to Recover Under § 550(a), the Trustee's § 549 Claim**

**Is Rendered Meaningless**

Because any distribution in this case is dependent on the Trustee successfully avoiding

the postpetition transfer of the Healthcare Assets to SKR Holdings, the Court will address the

Trustee's § 549 claim. SKR Holdings asserts that the Trustee may not avoid the post-petition

transfer of the Healthcare Assets because it paid DigitalBridge the value of the Healthcare

Assets. The Trustee contends that SKR Holdings has admitted avoidance under § 549 and

recovery under § 550, and the only determination the Court is required to make is the value of the

Healthcare Assets at the time of the transfer. The Court sees no substantive difference in the

parties' positions—both focus on what is "value" for purposes of § 550.

The Trustee argues that the "value" he is entitled to recover under § 550 is the full value

of the transferred property regardless of liens at the time of transfer. SKR Holdings argues that

the Trustee's recovery should be limited to recovery of the value of the equity in the transferred

property. SKR Holdings has the better argument. Defining value as the full value of, as opposed

to the equity in, the transferred property is inconsistent with § 550, which "prescribes the

measure of the trustee's recovery" for avoidable transfers.[73] Under § 550(a), a trustee may

recover "the property transferred, or if the court so orders, the value of such property" from the

transferee. "'Factors considered by courts in making this decision of whether to order recovery of

the property or its value include whether the property is recoverable, whether the property has

diminished in value by virtue of depreciation or conversion, whether there is conflicting evidence

as to the value of the property and whether the value of the property is readily determinable and a

---

[73] *McCord v. Agard (In re Bean)*, 252 F.3d 113, 116 (2d Cir. 2001).

43

monetary award would result in a savings to the estate.'"[74] The Trustee failed to specifically

address any of these factors. The Trustee does not seek to recover the Healthcare Assets, but

simply argues that he may recover the entire value of the Healthcare Assets regardless of liens

that encumber them. The "value of the property" a trustee is entitled to recover under § 550(a) is

the value of the equity in the property transferred.[75] In *United States v. Rauer*, the Tenth Circuit

stated that "[a]ny portion of a debtor's property that is unencumbered by mortgage—the

equity—is part of the bankrupt's estate."[76] Although the Circuit's statement in *Rauer* may not

technically coincide with the definition of "property of the estate" under § 541, which

encompasses property subject to liens,[77] the pronouncement is clearly consistent with other

sections of the Bankruptcy Code—specifically §§ 725 and 726.[78] Section 725 provides that

before final distribution of "property of the estate" the trustee "shall dispose of any property in

which an entity other than the estate has an interest, **such as a lien**."[79] Section 726, which directs

the distribution of "property of the estate," makes no provision for distributions to secured

creditors. These sections clearly distinguish "property in which an entity other than the estate has

---

[74] *Rushton v. Drive Fin. Servs. (In re Gardner)*, Adv. No. 05-2605, 2007 WL 2915847, at *3 (Bankr. D. Utah Feb. 23, 2007) (quoting 5 COLLIER ON BANKRUPTCY ¶ 550.02[3] (Alan N. Resnick & Henry J. Sommer eds., 15th ed. 2006)).

[75] *Joseph v. Madray (In re Brun)*, 360 B.R. 669, 674 (Bankr. C.D. Cal. 2007); *see also Bean*, 252 F.3d at 117.

[76] *United States v. Rauer*, 963 F.2d 1332, 1337 (10th Cir. 1992) (citation omitted).

[77] *See United States v. Whiting Pools, Inc.*, 462 U.S. 198, 207 (1983).

[78] Sections 542(a) and 554 refer to property that is of "inconsequential value" to the estate. Property that is fully encumbered has no value to the estate.

[79] § 725 (emphasis added).

an interest" (property which is subject to a lien) from "property of the estate" (property which is

not subject to liens).

Section 550(e)(1) specifically provides that a good faith transferee has a lien on **property**

**recovered** for improvements made after the transfer. However, there is no statutory or

contractual basis for any creditor to assert a lien in "value" recovered by the trustee. The secured

creditor would clearly receive a windfall if it could assert a lien in the transferred property that is

not recovered and a lien in the "value" recovered. "The purpose of § 550 is 'to restore the estate

to the financial condition it would have enjoyed if the transfer had not occurred' and the focus 'is

not on what the transferee gained by the transaction but rather on what the bankruptcy estate lost

as a result of the transfer.'"[80] If the trustee does not recover the transferred property, liens against

the transferred property are unaffected by the trustee's recovery of the "value" of the transferred

property, and the trustee does not need to satisfy those liens. The estate would clearly receive a

windfall if the trustee were permitted to recover the full value of the transferred property and not

be required to satisfy any liens against the property. It is the amount of equity in the transferred

property that is the "value" the trustee is entitled to recover. If the trustee recovers the "value" of

the transferred property, as opposed to the property itself, that "value" must be limited to the

equity in the transferred property.

For example, assume there is an asset worth $1,000,000, which is subject to a lien of

$900,000, that is transferred to a third party in exchange for $900,000, which is used to satisfy

and release the lien. If a trustee is permitted to recover a "value" of $1,000,000 from the

---

[80] *Gardner*, 2007 WL 2915847, at *3 (quoting *Weinman v. Fid. Capital Appreciation Fund (In re Integra Realty Res., Inc.)*, 354 F.3d 1246, 1267 (10th Cir. 2004)).

transferee, the secured creditor is clearly not entitled to a $900,000 lien in the "value" recovered because the creditor would then receive $1,800,000. But if the trustee is permitted to recover $1,000,000 free of the secured creditor's lien, the transferee must pay $1,900,000 (a $1,000,000 loss) and the trustee receives a $900,000 windfall. But if the trustee is permitted to recover the equity of $100,000, the estate is restored to the position it was in if the transfer had not been made.

Alternatively, assume an asset worth $1,000,000 is transferred subject to a $900,000 lien. If a trustee is permitted to recover a "value" of $1,000,000 from the transferee, it would be improper to allow the secured creditor an $900,000 lien in the "value" recovered because the creditor still has lien rights in the transferred property. The secured creditor would be able to recover $900,000 plus any amount it receives from the transferred property. But if the trustee is permitted to recover $1,000,000 free of the secured creditor's lien, the transferee must pay $1,000,000 plus the secured creditor in order to retain the property and the trustee receives a $1,000,000 windfall. But if the trustee is permitted to recover the equity of $100,000, the estate is restored to the position it was in if the transfer had not been made. Under either scenario, the value the trustee should recover is $100,000, which is the equity.

DigitalBridge lost nothing as a result of the transfer. Based on the little evidence regarding value that was presented, there clearly was no equity, or value, in the Healthcare Assets when they were transferred to SKR Holdings for $10,000. The Healthcare Assets were encumbered by SKR Credit's lien of $384,486.97 plus $9,730.70 in interest and the Equity Lenders' liens, which exceeded $400,000.

46

## **IV. CONCLUSION**

The Trustee has failed to produce credible evidence to support his claims for relief. On the petition date, SKR Credit had a valid, enforceable lien on DigitalBridge's assets. The Defendants did not engage in inequitable conduct. Rather, the Board members knowingly caused DigitalBridge to enter into agreements with the Defendants because they were desperate to limit their personal liability. The agreements were supported by consideration and gave SKR Credit a properly perfected security interest that had priority over the Equity Lenders' unperfected security interests. Pursuant to the agreements, DigitalBridge received nearly $400,000 and contemporaneously gave SKR Credit a lien of equal value. The Court therefore finds against the Trustee on his claims, and the Court will enter judgment against the Trustee.

_____END OF DOCUMENT_____

_____ooo0ooo_____

## SERVICE LIST

Service of the foregoing **MEMORANDUM DECISION** will be effected through the
Bankruptcy Noticing Center to the following parties.


Adam S. Affleck
Justin B. Bradshaw
PRINCE, YEATES & GELDZAHLER
15 West South Temple, Suite 1700
Salt Lake City, UT 84101
     *Attorneys for Plaintiff*

George Pratt
Jerome Romero
JONES, WALDO, HOLBROOK & McDONOUGH, P.C.
170 South Main Street, Suite 1500
Salt Lake City, UT 84101
     *Attorneys for Defendants*